**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                            :
In re:                                                      :    Chapter 7
                                                            :
GUALACEO REALTY CORP,                                       :    Case No.:  22-22099-rdd
                                                            :
                            Debtor.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**STIPULATION AND ORDER, PURSUANT TO BANKRUPTCY RULE 9019 AND
SECTIONS 105, 362, 363, 364, AND 502 OF THE BANKRUPTCY CODE, (I) SETTLING
AND ALLOWING THE CLAIMS OF WESTCHESTER AVENUE MIXED USE LLC;
(II) DETERMINING WESTCHESTER AVENUE MIXED USE LLC HAS FIRST
PRIORITY LIENS ON THE DEBTOR'S PROPERTY; (III) DIRECTING THE SALE
OF THE DEBTOR'S REAL PROPERTY; AND (IV) GRANTING RELATED RELIEF**

This stipulation and order (the "**Stipulation**") is entered into by and between (i) Howard

P. Magaliff (the "**Trustee**"), as chapter 7 trustee of the estate of Gualaceo Realty Corp. (the

"**Debtor**"), and (ii) Westchester Avenue Mixed Use LLC (the "**Lender**").  The Trustee and the

Lender are sometimes collectively referred to herein as the "**Parties**" and are sometimes each

individually referred to as a "**Party**."

## RECITALS

**I.      The Debtor's Ownership**

A.      The Debtor is a corporation organized and existing under the laws of the State of

New York with a principal place of business located at c/o Rich Michaelson Magaliff, LLP, 335

Madison Avenue, New York, New York 10017.

B.      Alejandro Quito is the sole shareholder of the Debtor.  Alejandro Quito and Rosa

Quito (collectively, the "**Quito Debtors**") are the debtors in a joint case filed in the United States

Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") under chapter

7 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") bearing Case No.

{00040702v2 }

21-22288-rdd (the "**Joint Case**"). The Trustee was appointed and is serving as the chapter 7 trustee of the bankruptcy estate of the Quito Debtors. By order dated September 7, 2021, the Trustee was granted authority pursuant to § 721 of the Bankruptcy Code to operate businesses and properties in which the Quito Debtors own an interest, including without limitation the real property located at 1838 Westchester Avenue, Bronx, New York 10472 (a/k/a 1265/1269 Theieriot Avenue, Bronx, New York 10472) (Block 3765, Lot 45) (the "**Real Property**"). The Trustee's operating authority ended on March 6, 2022.

## II.    The Debtor's Real Property and Business

C.    The Debtor is the fee owner of the Real Property. The Real Property is currently occupied by tenants pursuant to individual leases.

## III.    The Loans Against the Real Property

D.    On or about January 28, 2013, the Debtor, for the purpose of evidencing a loan (the "**Loan**") in the principal amount of $700,000.00, duly executed, acknowledged and delivered to Northeast Community Bank, a New York savings bank ("**NCB**"), as obligee, a Consolidated Mortgage Note January 28, 2013 (the "**Note**").

E.    For the purpose of securing payment of the indebtedness due in connection with the Loan and the Note, the Debtor, as mortgagor, duly acknowledged and delivered to NCB, as mortgagee, a certain Consolidation, Extension and Modification Agreement (Multi-Family) dated January 28, 2013 (the "**Mortgage**"). Pursuant to the Mortgage, the Debtor mortgaged to NCB the Real Property. The Mortgage was duly recorded in the office for the recording of mortgages in Bronx County (the "**Register's Office**") on February 15, 2013 under CRFN 2013000066895.

F.    Alejandro Quito, as guarantor (the "**Guarantor**"), duly executed, acknowledged and delivered to NCB a certain Unlimited Personal Guaranty with respect to the Loan dated January 28, 2013 (the "**Guaranty**"). Pursuant to the Guaranty, the Guarantor irrevocably and

unconditionally guaranteed to NCB, and its successors and assigns (including, without limitation, the Lender), the payment and performance of any and all Guaranteed Obligations (as that term is defined in the Guaranty) as and when the same shall be due and payable. The Note, the Mortgage, and the Guaranty, together with all other documents and/or agreements that were executed and/or delivered in connection with the Loan are collectively referred to herein as the "**Loan Documents**").

G.      Pursuant to, among other things (i) an Allonge to Note, dated as of October 11, 2019 (the "**Allonge**"), and (ii) an Assignment of Mortgage Without Covenant, dated as of October 11, 2019 (the "**Mortgage Assignment**"), the Note, the Mortgage, the Guaranty, and all of the other Loan Documents were duly assigned by NCB to the Lender. The Mortgage Assignment was recorded with the Register's Office on or about January 13, 2020.

H.      The Lender is the due and proper assignee of NCB with respect to all of the Loan Documents, is now the owner and holder of all of the Loan Documents, and the Lender is entitled to enforce its rights under all of the Loan Documents.

## IV.      Prepetition Litigation with the Lender

I.      On November 26, 2019, the Lender commenced an action (the "**State Court Action**") in the New York State Supreme Court in the County of Bronx (the "**State Court**") under Index No. 36638/2019E, by filing a summons and verified complaint against, among others, the Debtor seeking to, among other things, foreclose on the Real Property (the "**Foreclosure Complaint**").

J.      In the State Court Action, the Lender sought to foreclose and collect upon the Loan and exercise its rights under the Mortgage alleging numerous defaults including, but not limited to: (i) allowing that certain Judgment after Inquest in favor of Valcon Contracting Corp. to be docketed against the Real Property on or about August 28, 2018 (the "**Judgment**") in connection

with that certain litigation pending under Westchester County Supreme Court Index No. 50411/2016, which the Debtor failed to eliminate as an inferior lien from the Real Property for a period which exceeded fifteen (15) days after entry thereof (the "**Judgment Default**"); (ii) failing and omitting to pay water and sewer charges on the Real Property, which, as of November 6, 2019, had accrued in an amount in excess of $23,164.47 (the "**Water/Sewer Default**"); and (iii) as a result of the Judgment Default, failing and omitting to tender all unpaid interest due through and including November 11, 2019 (the "**Interest Payment Default**"), pursuant to and as set forth in the letter dated October 24, 2019 (the "**Default Letter**") the Lender sent to the Debtor notifying the Debtor of the Judgment Default and demanding payment of unpaid interest on the Loan, all constituting events of default as defined in the Loan Documents (collectively, the "**Events of Default**").

## V.    The Debtor's Bankruptcy Filing

K.    The shares of stock in the Debtor (the "**Shares**") are property of the Quito Debtors' estate.  On March 2, 2022 (the "**Petition Date**"), the Trustee, acting through ownership of the Shares, filed in the Bankruptcy Court a voluntary petition for relief for the Debtor under chapter 7 of the Bankruptcy Code.

L.    As a result of the bankruptcy filing, all litigation against the Debtor, including the State Court Action, has been stayed by virtue of section 362 of the Bankruptcy Code.

## VI.    The Lender's Claims and this Stipulation

M.    On account of the Loan and Mortgage, the Lender asserts a valid and perfected first priority secured claim against the Real Property and its other collateral in the estimated amount in excess of $1,238,943.40 as of March 31, 2022 (the "**Asserted Secured Claim**").

N.    The Lender alleges that pursuant to the Note, upon the occurrence of any default under any of the Loan Documents, after the expiration of applicable notice and grace periods,

interest on the Loan automatically accrues at the default rate of 24% per annum (the "**Default Rate**").

O.        The Lender alleges that the Debtor was not entitled to any notice or grace period with respect to the Events of Default (as defined in the Lender's Foreclosure Complaint).

P.        The Lender alleges that by reason of defaults under the Note and the Mortgage, Default Rate interest has accrued and continues to accrue on the Loan at least as of September 4, 2018.

Q.        The Parties are desirous of resolving all issues between them and liquidating the Real Property expeditiously consistent with the Trustee's duties under section 704(a)(1) of the Bankruptcy Code, and have engaged in extensive communications and discussions concerning the relative merits of the Parties' positions, and the most appropriate and fair mechanism for the Trustee's liquidation of the Real Property, resulting in the agreement set forth in this Stipulation.

        **NOW THEREFORE**, the Parties hereby stipulate and agree, through their undersigned counsel, and intending to be bound, as follows:

1.        **Incorporation of Recitals**.  The foregoing recitals are hereby incorporated herein by reference hereby, are expressly acknowledged and agreed to by the Parties, and shall have the same force and effect as if in the body of this Stipulation.

2.        **Bankruptcy Court Approval**.  This Stipulation is subject to the Bankruptcy Court so-ordering this Stipulation. If this Stipulation is not "So-Ordered" by the Bankruptcy Court, then this Stipulation shall be void *ab initio.*

3.        **Allowance of The Lender's Claims and Liens**.

        (a)        The Trustee has reviewed and investigated the Loan Documents and the Asserted Secured Claim and has determined in his business judgment that it is in the best interest of the Debtor and the Debtor's estate to enter into this Stipulation.

(b)     The Lender's claim under the Loan Documents is hereby permanently settled, fixed, liquidated and allowed in the sum of $1,238,943.40,[1] as of March 31, 2022, plus all interest at the Default Rate accruing on and after April 1, 2022, plus any and all additional amounts (collectively, the "**Claim Additions**") for fees, costs, expenses (including, without limitation, attorneys' fees and expenses), protective advances (including any "**Lender Advances**," as defined below) made on or after April 1, 2022 with respect thereto (such aggregate amount is hereinafter referred to as the "**Allowed Claim**"). For the avoidance of doubt, the amount of all protective advances and Lender Advances shall automatically be added to the amount of, and be part of, the Allowed Claim.

(c)     The Allowed Claim hereby forever constitutes an allowed, legal, valid, binding, enforceable and non-avoidable claim and obligation of the Debtor and the Debtor's estate, and is not subject to any offset, setoff, defense, counterclaim, recoupment, deduction, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law. Neither the Debtor, the Debtor's estate nor the Trustee possesses or will assert any claim, counterclaim, setoff or defense of any kind, nature, or description which would in any way affect the validity, amount, enforceability, and non-avoidability of any part of the Allowed Claim. Nothing in this Stipulation shall in any way whatsoever limit or reduce any obligations of the Guarantor concerning or with respect to the Loan Documents or the Lender's Allowed Claim.  The Lender expressly reserves any and all rights to pursue claims against any third parties, including against any guarantor of the Loan.  Any compromise in the amount of the Lender's claim pursuant

---

[1]  This sum includes interest, default rate interest, attorneys' fees and expenses and protective advances only through March 15, 2022. In addition, the amount of all Lender Advances made by the Lender (together with interest thereon at the Default Rate from the date of any Lender Advance) and the amount of any Carve Out Expenses shall be automatically added to the amount of, and be part of, the Allowed Claim.

to this Stipulation is not intended to, and shall not, inure to the benefit of any guarantor of the Loan.

(d)     As of the Petition Date, the Allowed Claim is fully secured pursuant to the Loan Documents by valid, perfected, enforceable and non-avoidable first priority security interests, mortgages and liens granted by the Debtor to the Lender upon all of the collateral and mortgaged property (including, without limitation, the Real Property) described in the Loan Documents existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof whether generated, arising or existing prior to or after the Petition Date (collectively, together with any other property of the Debtor's Estate (as used herein "**Estate**" shall include all items included under section 541 of the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender (or NCB) prior to the Petition Date, being referred to herein as "**Pre-Petition Collateral**"), which liens of the Lender are senior to all other liens on the Pre-Petition Collateral. The Trustee and the Estate will not assert any claim, counterclaim, setoff, or defense of any kind, nature or description which would in any way affect the validity, amount, enforceability and non-avoidability of any part of the Allowed Claim or any of the Lender's claims, liens, mortgages, or security interests in any of the Pre-Petition Collateral. The acknowledgment and agreement by the Trustee of the Allowed Claim and the liens, rights, priorities and protections granted to or in favor of the Lender as set forth herein and in the Loan Documents and this Stipulation shall constitute a valid proof of claim on behalf of the Lender in this case and the Bankruptcy Court hereby orders that the Lender shall not be required to file any further proof of claim in this case. Without limiting the foregoing, (i) all proceeds of any sale of the Real Property (including, without limitation, any proceeds substitutions and replacements of the Real Property, including without limitation, from any closing of a sale of the Real Property, any contract rights with respect to any contract to sell the Real

Property, and any deposits and other amounts to which the Trustee is entitled from any contract or

attempt to sell the Real Property); and (ii) all rents, use and occupancy amounts and/or fees from

any tenants or any other persons with respect to the Real Property (collectively, the "**Rents**"), in

each case (i) and (ii) whether existing or arising before, on or after the Petition Date constitute part

of the Lender's Pre-Petition Collateral and the Lender has a perfected, non-avoidable first priority

security interest, mortgage and lien therein and thereon.

(e)    As adequate protection to the Lender for the liens, rights, priorities, claims

and protections granted to it pursuant to the Loan Documents and this Stipulation and other than as

set forth in Paragraph 8 herein, the Lender is hereby granted: (a) replacement liens on all property of

the Debtor's Estate other than Chapter 5 avoidance actions and the proceeds thereof, including

without limitation, the Real Property, Rents, contract rights, deposits, cash collateral, the Cash

Collateral Account (defined below), all whether existing or arising before, on or after the Petition

Date (collectively, the "**Replacement Liens**"), to secure the Allowed Claim and the Lender's claims

hereunder, which Replacement Liens (i) shall be and shall continue to be first and senior in priority

to all other interests, security interests, mortgages, liens and encumbrances of every kind, nature and

description, whether created consensually, by an order of the Bankruptcy Court or any other court, or

otherwise, including, without limitation, liens or interests granted in favor of third parties in

conjunction with sections 363, 364, and/or any other sections of the Bankruptcy Code or other

applicable law, and (ii) shall not at any time whatsoever be made subject or subordinate to, or made

*pari passu* with, any other lien, security interest or claim against any property of the Trustee or the

Debtor's Estate, whether any such liens now exist or are hereafter created, pursuant to sections

363 or 364 of the Bankruptcy Code or otherwise; and (b) a priority administrative expense claim

pursuant to section 507(b) of the Bankruptcy Code in the amount of any decline in the value of any

Pre-Petition Collateral and any Rents paid by the Trustee to any third person from and after the Petition Date (the "**Adequate Protection Administrative Claim**") having priority over all any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Debtor or the Trustee (or any successor trustee in this case), including, without limitation, any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and other sections of the Bankruptcy Code, and shall at all times be senior to the rights of the Trustee, any successor trustee, or any creditor or other party in interest in this case or any subsequent proceedings or cases under the Bankruptcy Code; provided, however, the Adequate Protection Administrative Claim shall be subject and subordinate in all respects to the Carve-Out Expenses (as defined in Paragraph 8 below).

(f)      This Stipulation shall be sufficient and conclusive to effectuate the priority, perfection, and validity of the security interests and liens granted hereby, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, possession or control with respect to the Rents and the Cash Collateral Account (as defined below) or other act to validate or perfect such security interest, mortgage, or liens including, without limitation, any control agreements with any financial institutions, banks or securities intermediary holding any depository, brokerage, or securities account consisting of any collateral of the Lender.

4.      **Management and Sale of the Real Property Generally**.  The Trustee will proceed expeditiously with the marketing and sale of the Real Property (the "**Sale**") pursuant to section 363 of the Bankruptcy Code in the manner that the Trustee and the Lender agree will maximize the value of the Real Property and liquidate the Real Property as quickly as possible.  The bidding

procedures, terms of sale, and the conduct of the auction will be subject to Lender's consent, which shall not be unreasonably withheld, and to the Bankruptcy Court's approval, and the Trustee will consult with the Lender prior to filing an application for their approval.  The Trustee will seek the Bankruptcy Court's approval of the proposed auction and sale mechanics and procedures.

5.      **Retention of Brokers**.  The Trustee has retained MYC & Associates, Inc. ("**MYC**") (the "**Broker**") to market, sell and auction the Real Property.  The Broker will be entitled to compensation including reimbursement of expenses, and subject to Bankruptcy Court approval shall be paid (i) a buyer's premium of five percent (5%) of the amount of the successful bid at an auction of the Real Property, if the Real Property is sold to a person that is not the Lender (or any designee or assignee thereof), or (ii) a commission of two percent (2%) if the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) acquires the Real Property by a Lender Bid (as defined below).  The terms of sale for any Sale shall provide, among other things, that bidders other than the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) shall pay a buyer's premium of five percent (5%) of the sale price.  In the event that the Lender (or any designee or assignee thereof) is the winning bidder, the total commission to the Broker of two percent (2%) will include marketing and advertising expenses incurred in connection with the sale of the Real Property. The Broker will absorb all marketing and advertising expenses incurred in connection with the sale of the Real Property.

6.      **Retention of Property Manager**.  The Trustee has retained MYC (the "**Manager**") to manage the Real Property and collect Rents until consummation of the Sale, and subject to Bankruptcy Court approval to be paid at the rate of $325 for principals and $125 for associates.  Any compensation or management fees due to the Manager for management of the

Property for the period predating execution of this Stipulation will be paid from funds held by the Trustee in in the Joint Case.

       7.    **<u>Management of the Real Property</u>**.

       (a)    <u>Operation of the Real Property</u>.  The Manager will manage the Real Property as the Trustee's agent until consummation of the Sale.

       (b)    <u>Operating Budget</u>. In consultation with the Manager, the Trustee will create and propose to the Lender a budget (the "**Budget**") to operate the Real Property.  A budget that has been approved in writing by the Lender is referred to herein as an "**Approved Budget**".  Any non-emergency operating expenses of more than $5,000 shall require prior written approval by the Lender prior to incurrence and payment by the Manager.  Any disagreement regarding the Budget or payment of any operating expenses contemplated in the Budget, will be submitted to the Bankruptcy Court for resolution.  Notwithstanding the foregoing, the Lender cannot be compelled to make a Lender Advance (as defined below) as part of a Budget or otherwise without the Lender's express consent.

       (c)    <u>Rental Income</u>.  All Rents shall constitute "cash collateral" (as defined in section 363(a) of the Bankruptcy Code), and part of Lender's Pre-Petition Collateral and the Lender shall also have a Replacement Lien thereon.  The Trustee is maintaining and will maintain a single bank account into which he will only deposit or receive transfers of funds that constitute either Rents or other cash collateral of Lender (the "**Cash Collateral Account")**.  All Rents collected by the Manager will be remitted by the Manager to the Trustee and held by the Trustee in the Cash Collateral Account.  For the avoidance of doubt, the Trustee hereby grants the Lender a first priority lien on all Rents arising after the Petition Date and all proceeds thereof (including without limitation all funds) in the Cash Collateral Account and the Lender hereby has a perfected and unavoidable lien and security interest in all cash collateral and the Cash Collateral Account,

which liens secure the Lender's Allowed Claim.  The Trustee will not deposit any monies other than Rents or other cash collateral of Lender into the Cash Collateral Account.  The Trustee is authorized to pay expenses related to the Real Property directly from the Rents deposited in the Cash Collateral Account, provided that such expenses are set forth in an Approved Budget or are otherwise expressly approved by the Lender in writing.

(d)    Protective Advances. In the event the Rents are insufficient to pay an expense from an Approved Budget or any other expense that the Trustee requests to pay in order to sell or preserve the value of the Real Property, then in the Lender's sole and absolute discretion the Lender may, but will not be required to, pay such item directly (or may advance the Trustee the funds to pay such item) any such expenses paid or advanced by the Lender shall be deemed to be a necessary protective advance pursuant to the Loan Documents (each a "**Lender Advance**"). Pursuant to and in accordance with the Loan Documents, any and all Lender Advances shall accrue interest at the Default Rate (but only to the extent that the Real Property is sold for more than $1,224.583.54,[2] and shall be automatically part of, and increase the amount of, the Lender's Allowed Claim.

8.    **Carve-Out of Liens**.  The Lender's liens, claims and security interests in the Real Property shall be subject only to the right of payment of the following expenses in the event the proceeds from the sale of the Real Property are not sufficient to pay the Lender's Allowed Claim in full ("**Carve Out Expenses**"):

(a)    Subject to the terms and conditions of this Stipulation, in the event of the closing of a sale of the Real Property, which sale is conducted in accordance with terms and conditions of this Stipulation, subject to the Lender's rights to oppose the Trustee's Motion for

---

[2] As of March 1, 2022.

Approval of the Sale to the Successful Bidder after Auction, the commissions (but not expenses) of any retained Broker but only to the extent: (i) the Lender has agreed in writing to the retention of such particular broker(s) and the terms and commissions thereof; (ii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is not the successful bidder at an auction of the Real Property and such successful bidder takes title to the Real Property, such commissions do not exceed the aggregate sum of five percent (5%) of the amount bid by such successful bidder, but only to the extent that such commission is actually paid by such successful bidder in the form of a buyer's premium; and (iii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is the successful bidder at an auction of the Real Property and takes title to the Real Property, such commissions do not exceed the aggregate sum of two percent (2%) of the amount bid by the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) (the applicable amount set forth in this Paragraph 8(a) is referred to herein as the "**Broker Carve Out**");

(b)    Subject to the terms and conditions of this Stipulation, the unpaid and outstanding: (i) reasonable commissions, fees and expenses of the Trustee approved by a final order of the Bankruptcy Court pursuant to section 326 of the Bankruptcy Code ("**Allowed Trustee Fees**"); and (ii) the reasonable fees and expenses actually incurred and approved by a final order of the Bankruptcy Court pursuant to sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, "**Allowed Professional Fees**") by the attorneys and accountants retained under section 327 of the Bankruptcy Code by the Trustee (collectively, the "**Professionals**"), in a cumulative, aggregate sum for all Professionals, not to exceed $35,000 ("**Professional Fee Carve**

Out"), (iii) compensation or management fees of the Manager in an amount not to exceed $1,500 per month, but excluding any amounts payable to the Broker, which shall be subject to the provisions set forth in Paragraph 8(a) above.

(c)      Notwithstanding anything to the contrary contained herein, Lender's liens, claims and security interests in the Real Property will not be subject to payment of the Carve Out Expenses to the extent the Debtor's estate has cash available to pay such expenses from Rents or other cash collateral as that term is defined in § 363(a) of the Bankruptcy Code.

9.      Notwithstanding anything to the contrary in this Stipulation, the Professional Fee Carve Out shall not be used to pay any Allowed Professional Fees incurred in connection with any of the following: (a) a request to use any cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of the Lender, (b) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise other than from the Lender unless such other financial accommodations repay to the Lender the Lender's Allowed Claim and all other amounts owed to the Lender, indefeasibly and in full, simultaneously within the closing of any such other financial accommodations, (c) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Lender or any of its respective officers, directors, members, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under chapter 5 of the Bankruptcy Code, or (d) any act which has or could have the effect of materially and adversely modifying or compromising any of the rights and remedies of the Lender, or which is contrary, in a manner that is material and adverse to the Lender to any term or condition set forth in or acknowledged by this Stipulation or any of the Loan Documents.

10.     At the Lender's sole and absolute discretion, the Lender may fund at any time and in any increment an amount equal to the Carve-Out Expenses by, among other things, making one or more Lender Advances (the amount of which shall be automatically added to the amount of the Lender's Allowed Claim owed by the Debtor and obligors under the Loan Documents) in order to pay any Professional in respect of the Professional Fee Carve-Out or any other party entitled to receive payment in respect of a Carve Out Expense.

11.     Any payment or reimbursement made either directly by or on behalf of the Lender at any time or by or on behalf of the Trustee in respect of any Allowed Professional Fees, Allowed Trustee Fees, or any fees and expenses of the Trustee or any of the Trustee's Professionals prior to the approval thereof by the Bankruptcy Court shall, in either case, permanently reduce the amount of the Professional Fee Carve Out on a dollar-for-dollar basis. The Lender's obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses is hereby added to and made a part of the amount the Lender's Allowed Claim, secured by the Pre-Petition Collateral, and the Lender is hereby entitled to all of the rights, claims, liens, priorities and protections under this Stipulation, the Loan Documents, the Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of the Lender (or by or on behalf of the Trustee), shall not, and shall not be deemed to, reduce the amount of the Lender's Allowed Claim and shall not, and shall not be deemed to, subordinate (i) any of the Lender's liens and security interests in the Pre-Petition Collateral or other collateral granted hereby or (ii) the Lender's Adequate Protection Administrative Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses, the Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or disbursements of

the Trustee or any Professionals incurred in connection with this case (or any subsequent case under any chapter of the Bankruptcy Code), and nothing in this Stipulation shall be construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses of the Trustee or any Professional, or to ensure that the Trustee or the Estate has sufficient funds to pay such compensation or reimbursement.

12.     Each of the Parties reserves the right to object to the allowance of any fees, expense or commissions sought to be paid to the Trustee or any Professionals, all of which are subject to allowance by the Bankruptcy Court.

13.     **Purchaser Responsibilities**.  Unless otherwise agreed by the Lender, the terms of sale proposed by the Trustee with respect to any Sale of the Real Property shall require that the purchaser(s) of the Real Property will be responsible for the payment of: (i) any buyer's premium to the Broker (provided that neither the Lender nor any designee or assignee thereof, as long as such designee or assignee is affiliated with the Lender, and is not an unrelated third party); (ii) any real property taxes and transfer taxes; and (iii) any amounts due on account of fines and violations.

14.     **Lender's Right to Credit Bid**.

(a)     Notwithstanding anything to the contrary whatsoever, the Lender (or its designee or assignee) may, at any Sale of all or any part of the Real Property, credit bid (a "**Lender Credit Bid**") all or any part of its Allowed Claim, up to the full amount of the Allowed Claim plus all Lender Advances plus all other Claim Additions (permitted pursuant to Paragraph 3(b)), pursuant to any terms of sale. Furthermore, notwithstanding anything to the contrary, the Lender (or its designee or assignee) shall not be required to deliver any deposit to the Trustee or to pay any buyer's premium at any time.  In the event any Lender Credit Bid is deemed the highest and best offer and the Sale is made to the Lender (or its designee or assignee), then any commissions

due the Brokers will be paid by the Trustee from the Lender Bid Cash Component (as defined below).

(b)    If and only if (i) the Lender (or its designee or assignee) is the successful bidder at a Sale of the Real Property on account of a Lender Credit Bid and (ii) the bid actually submitted by the Lender (or its designee or assignee ) (such actual bid being the "**Lender Bid**") did not include at least $1,250,000.00 in cash in excess of the Lender Credit Bid, then notwithstanding that the Lender (or its designee or assignee) submitted a Lender Credit Bid, at the actual closing of the Sale of the Real Property, the Lender Bid shall be deemed modified to be as follows:

　　　　i.    The Lender Bid shall be (i) $1,250,000.00 in cash (the "**Lender Bid Cash Component**"), **PLUS** (ii) a credit bid in an amount equal to: (x) the amount of the Lender Bid, less (y) the amount of the Lender Bid Cash Component (such modified credit bid amount being the "**Resulting Credit Bid**").

15.    **Payment of The Lender's Allowed Claim and Lender's Deficiency Claim**.

(a)    No later than one (1) business day following the Trustee's receipt of any proceeds of sale of the Real Property whether from a third-party bidder or from the Lender Bid Cash Component (collectively, the "**Sale Proceeds**"), the Trustee shall initiate a wire transfer to the Lender (pursuant to such wire instructions as the Lender shall provide to the Trustee) in an amount equal to the Allowed Claim, subject, only if the amount of the Sale Proceeds is less than the Amount of the Allowed Claim, to the carve-outs authorized by this Stipulation (the "**Lender Payment**").[3]

---

[3] The Trustee has explained to the Lender the United States Trustee's general limitations on the use of wire transfers pursuant to Section 5(F)(2) of the United States Trustee's Handbook for Chapter 7 Trustee, effective October 1, 2012, and requested to make this payment by estate check.  The Lender insisted that the payment be made by wire and that it was a material condition to entry into this Stipulation.

(b)      In the event that the Sale Proceeds from the Sale of the Real Property are not sufficient to pay the Lender's Allowed Claim in full, then the Lender shall automatically have a deficiency claim (the "**Deficiency Claim**") under the Loan Documents in the amount equal to the sum of:

(i)  the amount of the Lender's Allowed Claim on the date of the Lender's receipt of the Lender Payment; **PLUS**

(ii) any Claim Additions (excluding post-petition interest); **PLUS**

(iii) the amount of the Lender Bid Cash Component, if the Lender (or its assignee or designee) is the purchaser of the Real Property and such amount was paid to the Trustee; **LESS**

(iv) the amount of the Lender Payment; **LESS** (but, if and only if the Lender or its assignee or designee is the purchaser of the Real Property and made a Lender Credit Bid)

(v) (A) if the Lender Bid Cash Component was paid to the Trustee, the amount of the Resulting Credit Bid, or (B) if no Lender Bid Cash Component was paid to the Trustee, the amount of the actual Lender Credit Bid.

The Deficiency Claim shall be an allowed claim.

16.      For the avoidance of doubt, the Lender shall be entitled to share in all other assets of the Estate and receive distributions on account of its Deficiency Claim.

17.      **Trustee's and Trustee's Professionals Administrative Costs and Compensation**.  Except for the Carve Out Expenses, no costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the Lender or any of the Lender's collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the Lender.

18.      **Binding Terms**. The terms of this Stipulation shall be binding upon all parties in interest. The Lender's Allowed Claim shall constitute: (i) an allowed claim, not subject to subordination and otherwise unavoidable, for all purposes in this case, other than as specifically

set forth herein, (ii) the prepetition liens of the Lender on or related to the Lender Collateral, which shall be deemed legal, valid, binding, perfected, not subject to defense, claim, counterclaim, re-characterization, offset of any kind, subordination, and otherwise unavoidable, and (iii) associated prepetition liens, which shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's Estate against the Lender all of which have been forever waived and released.

19.    **Amendment and Waivers**.  This Stipulation may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing, signed by all Parties and approved by order of the Bankruptcy Court.

20.    **Complete Agreement**.  This Stipulation constitutes the entire agreement and understanding between and among the Parties relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings (written or oral), among the parties hereto with respect to such subject matter.

21.    **Binding Effect**.  The Trustee will promptly take the actions required to obtain the Bankruptcy Court's approval of the terms of this Stipulation.  Upon Bankruptcy Court approval of this Stipulation, this Stipulation will be binding upon the Trustee, the Debtor's Estate and the Lender, and their successors and assigns. The provisions of this Stipulation, and any and all rights, remedies, privileges, and benefits in favor of the Lender provided or acknowledged in this Stipulation, and any actions taken pursuant thereto, shall be effective immediately upon this Stipulation being "So-Ordered" or the entry of an order by the Bankruptcy Court approving this Stipulation pursuant to Bankruptcy Rules 6004 and 7062 (and any stay is hereby dispensed with), shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation, any Order which may be entered by the Bankruptcy Court, including any Order

dismissing this case or abandoning the Real Property.  Any Order dismissing this case under section 707(a) of the Bankruptcy Case or otherwise, or permitting the abandonment of the Real Property shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (a) the Lender's liens in all of its collateral shall continue in full force and effect notwithstanding such dismissal or abandonment until all obligations have been paid to the Lender in full; and (b) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal or abandonment, for the purposes of enforcing the claims of the Lender and its liens in any collateral.

22.    **Choice of Law and Jurisdiction**.  This Stipulation shall be construed, and the rights and liabilities of the Parties hereto shall be determined, in accordance with the laws of the State of New York and applicable Federal law.  The Parties hereby consent to the resolution of any and all disputes arising under, in connection with or relating to this Stipulation, and any claims or actions based upon this Stipulation, by and under the exclusive jurisdiction of the Bankruptcy Court.

23.    **Further Assurances**.  Each Party agrees at any time and from time to time at each such Party's own expense, upon request of a Party hereto, as applicable, to promptly execute, deliver, or obtain or cause to be executed, delivered or obtained any and all further instruments and documents and to take or cause to be taken all such other action such Party, as applicable, may deem reasonably desirable in obtaining the full benefits of this Stipulation.

24.    **Headings: Interpretation**. Section and subsection headings are for convenience of reference only, are not part of this Stipulation and shall not affect the construction of, or be taken into consideration in interpreting, this Stipulation. For purposes of this Stipulation: (i) the term "including" shall be deemed to mean "including, without limitation;" (ii) the term "person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited

liability company, unincorporated organization or association, or trustee; and (iii) whenever the context of this Stipulation reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Stipulation has been prepared and drafted through a joint effort of the Parties hereto and, therefore it shall not be construed against any of the Parties as the person who prepared or drafted this Stipulation.

25.    **Execution in Counterparts**.  This Stipulation may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   This Stipulation may be executed by electronic signatures, including without limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

26.    **Expenses**.  Each Party shall pay its own fees, costs, expenses and disbursements in connection with the preparation, execution and delivery of this Stipulation and each of the other documents executed in connection herewith and the transactions contemplated hereby.

27.    **Successors and Assigns**. This Stipulation shall be binding on and inure to the benefit of the successors and assigns of each of the Parties.

Dated:  March 31, 2022
       New York, New York

                         RICH MICHAELSON MAGALIFF, LLP

                         By: /s/ Howard P. Magaliff
                              Howard P. Magaliff
                              335 Madison Avenue, 9th Floor
                              New York, New York 10017
                              Tel: 646.453.7853

                         *Counsel for the Trustee*

Dated:  March 31, 2022
       New York, New York

                         RUBIN LLC

                         By: /s/ Paul A. Rubin
                              Paul A. Rubin
                              345 Seventh Avenue, 21st Floor
                              New York, New York 10001
                              Tel: 212.390.8054

                         *Counsel for Westchester Avenue Mixed Use LLC*

**SO ORDERED**

This 2nd day of May 2022

*/s/Robert D. Drain*

HON. ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE